IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GLOBAL NEIGHBORHOOD; REFUGEE CONNECTIONS OF SPOKANE; SPOKANE CHINESE ASSOCIATION; ASIAN PACIFIC ISLANDER COALITION – SPOKANE; SPOKANE CHINESE AMERICAN PROGRESSIVES; and the SPOKANE AREA CHAPTER OF THE NATIONAL ORGANIZATION OF WOMEN, | ) ) ) ) ) ) ) ) ) ) | No. 35528-4-III |
| Respondents, | ) ) | |
| v. | ) ) | |
| RESPECT WASHINGTON, | ) ) | |
| Appellant, | ) ) | |
| VICKY DALTON, SPOKANE COUNTY AUDITOR, in her official capacity; and the CITY OF SPOKANE, | ) ) ) ) | |
| Respondents. | ) | |

No. 35528-4-III

PUBLISHED OPINION

FEARING, J. — In this well briefed and astutely argued appeal by both sides, we face the intimidating and humbling task of classifying, as either administrative or legislative, a city initiative that authorizes without restriction city employees to question individuals as to immigration status. This classification determines the eligibility of the

initiative for vote by the people of Spokane. The appeal raises other issues, including the mootness of the suit after the city council amended a city ordinance referenced in the initiative, the standing of challengers to obtain an injunction removing the initiative from the ballot, the imposition of a statute of limitations to a suit challenging a proposed initiative, the application of laches to preclude a suit challenging an initiative, the legality of the initiative in light of state and federal law, and the implication of the initiative backers' First Amendment rights. Because the proposed initiative arises from an administrative framework, because the initiative entails directions to city employees, because the initiative meddles in the administration of the city's police force and may interfere in effective law enforcement, and because the initiative runs contrary to state, if not, federal law, we declare the initiative administrative in nature. We affirm the trial court's grant of an order enjoining placement of the initiative on the ballot.

FACTS

This appeal concerns the validity of "Proposition 1," a proposed City of Spokane initiative originally scheduled for placement on the November 2017 ballot. The gist of the initiative would allow Spokane city employees, including law enforcement officers, to question without any restriction individuals about their immigration status and citizenship status, permit employees to assemble information on residents' immigration status, and share the information with others. The background to the lawsuit precedes the filing of the initiative and begins with state law and continues with Spokane Police

2

Department internal policy and Spokane ordinances adopted by the Spokane City Council. We review, but heavily redact for purposes of shortening an already lengthy opinion, state law, police department policy, and city ordinances before identifying the history and content of Proposition 1.

We begin with some background to the challengers of Proposition 1, which challengers initiated this declaratory suit to declare Proposition 1 invalid. Plaintiff Global Neighborhood, a nonprofit organization, operates under the mission statement to "'provide former refugees with opportunities for holistic development.'" Clerk's Papers (CP) at 7. Global Neighborhood serves former refugees living in the city of Spokane by engaging in activities aimed at improving quality of life, such as providing employment at a thrift shop it owns and operates.

Plaintiff Refugee Connections of Spokane, also a nonprofit organization, develops projects, programs, and resources that benefit refugees and immigrants and their communities in Spokane. In support of the suit, Amina Abdul-Fields, Chair of the Board of Directors of Refugee Connections, submitted a declaration. Abdul-Fields averred that Refugee Connections' many services to refugees and immigrants include the Harvest Project, Patient Passports, and Interpreter Training. The organization promotes civic engagement through police potlucks, law and justice workshops, and the World Refugee Day Celebration. Refugee Connections understands that many immigrants arrive from nations wherein authority symbolizes a threat. The law and justice workshop seeks to

foster a positive view of the United States legal system, explain how the American criminal justice system functions, identify key civil liberties, and provide written information on where to seek assistance in protecting those rights.

Amina Abdul-Fields declared that members of the immigrant and refugee community served by Refugee Connections will become targeted and injured by changes to law enforcement profiling resulting from the passage of Proposition 1. The immigrant community will be subjected to additional stops by Spokane police officers solely on the basis of the person's appearance, accent, or mannerisms. Increased contact with law enforcement based solely on immigration status will increase fear and reluctance on the part of refugees to contact police or seek protections from the legal system. Abdul-Fields concluded that adoption of Proposition 1 will challenge Refugee Connections' ability to serve the immigrant and refugee community.

Spokane Chinese Association, a nonprofit association, was formed by people of Chinese cultural heritage residing in the Spokane area. The organization strives to advance communication and friendship among its members and to enrich their lives and local culture by organizing activities related to Chinese culture or common interests. The plaintiff Asian Pacific Islander Coalition—Spokane promotes equitable access to culturally competent and linguistically accessible health and human services, economic development for small businesses, civil and human rights, and equal access to education for Asian Pacific Americans, including immigrants, refugees, and citizens.

Each plaintiff organization contends it serves members of the community that will be adversely targeted by changes to law enforcement profiling resulting from the passage of Proposition 1. We refer to the plaintiffs collectively as "Global Neighborhood."

The parties agree that this appeal poses no direct question as to whether city employees' seeking and sharing of the immigration status of individual constitutes racial profiling. Nevertheless, this appeal in part embodies the relationship between racial profiling and enforcing immigration law. Global Neighborhood claims that Proposition 1 promotes racial profiling. RCW 43.101.410, enacted in 2002, directs local law enforcement agencies to address racial profiling. The statute declares, in part:

> (1) Local law enforcement agencies shall comply with the recommendations of the Washington association of sheriffs and police chiefs regarding racial profiling, as set forth under (a) through (f) of this subsection. Local law enforcement agencies shall:
> (a) Adopt a written policy designed to condemn and prevent racial profiling;
> (b) Review and audit their existing procedures, practices, and training to ensure that they do not enable or foster the practice of racial profiling;
> (c) Continue training to address the issues related to racial profiling. Officers should be trained in how to better interact with persons they stop so that legitimate police actions are not misperceived as racial profiling;
> (d) Ensure that they have in place a citizen complaint review process that can adequately address instances of racial profiling. The process must be accessible to citizens and must be fair. Officers found to be engaged in racial profiling must be held accountable through the appropriate disciplinary procedures within each department;
> (e) Work with the minority groups in their community to appropriately address the issue of racial profiling; and
> (f) Within fiscal constraints, collect demographic data on traffic stops and analyze that data to ensure that racial profiling is not occurring.

In explaining the 2002 law, the legislature declared:

> [R]acial profiling is the illegal use of race *or ethnicity* as a factor in deciding to stop and question, take enforcement action, arrest, or search a person or vehicle with or without a legal basis under the United States Constitution or Washington [S]tate Constitution.

LAWS OF 2002 ch. 14, § 1(1) (emphasis added).

> The legislature recognizes that the president of the United States has issued an executive order stating that stopping or searching individuals on the basis of race is not an effective law enforcement policy, that it is inconsistent with democratic ideals, especially the commitment to equal protection under the law for all persons, and that it is neither legitimate nor defensible as a strategy for public protection.

LAWS OF 2002 ch. 14, § 1(2).

We move to policies and ordinances of the city of Spokane, Washington State's second city with a 2017 estimated population of 217,300. The Spokane City Council delegated the authority to adopt police department policy to the city police department and its chief. Spokane Municipal Code (SMC) 3.10.010(B)(1) provides:

> The chief of police administers the Spokane police department and the police reserve force and has the authority to make rules and issue orders for the proper functioning of the division, consistent with law, council policy, and the rules of civil service commission.

Presumably to comply with RCW 43.101.410, the Spokane Police Department adopted policies 402 and 428. Policy 402 reads, in part:

**Bias-Based Policing**

**402.1 PURPOSE AND SCOPE**

6

This policy provides guidance to department members and establishes appropriate controls to ensure that employees of the Spokane Police Department do not engage in racial-or bias-based profiling or violate any related laws while serving the community.

402.1.1 DEFINITION
Definitions related to this policy include:

**Racial-or bias-based profiling** - An inappropriate reliance on factors such as *race, ethnicity, national origin*, religion, sex, sexual orientation, economic status, age, cultural group, disability or affiliation with any other similar identifiable group as a factor in deciding whether to take law enforcement action or to provide service.

**402.2 POLICY**
The Spokane Police Department is committed to providing law enforcement services to the community with due regard for the racial, cultural or other differences of those served. It is the policy of this department to provide law enforcement services and to enforce the law equally, fairly and without discrimination toward any individual or group.
*Race, ethnicity or nationality*, religion, sex, sexual orientation, economic status, age, cultural group, disability or affiliation with any other similar identifiable group shall not be used as the basis for providing differing levels of law enforcement service or the enforcement of the law.

**402.3 RACIAL-OR BIAS-BASED PROFILING PROHIBITED**
Racial-or bias-based profiling is strictly prohibited. However, nothing in this policy is intended to prohibit an officer from considering factors such as race or ethnicity in combination with other legitimate factors to establish reasonable suspicion or probable cause (e.g., suspect description is limited to a specific race or group).

SPOKANE POLICE DEPARTMENT, POLICY MANUAL §§ 402.1-402.3 at 238 (adopted Feb. 9,

2016. https://static.spokanecity.org/documents/police/accountability/police-policy-

manual-2016-02-09.pdf. (Emphasis added).

Spokane Police Department Policy 428 declares in part:

7

**Immigration Violations**
**428.1 PURPOSE AND SCOPE**
The immigration status of individuals alone is generally not a matter for police action. It is incumbent upon all employees of this department to make a personal commitment to equal enforcement of the law and equal service to the public regardless of immigration status. Confidence in this commitment will increase the effectiveness of the Department in protecting and serving the entire community.

**428.2 DEPARTMENT POLICY**
The U.S. Immigration and Customs Enforcement (ICE) has primary jurisdiction for enforcement of the provisions of Title 8, United States Code (U.S.C.) dealing with illegal entry. When assisting ICE at its specific request, or when suspected criminal violations are discovered as a result of inquiry or investigation based on probable cause originating from activities other than the isolated violations of Title 8, U.S.C., §§ 1304, 1324, 1325 and 1326, this department may assist in the enforcement of federal immigration laws.
. . . .
428.3.1 BASIS FOR CONTACT
Unless immigration status is relevant to another criminal offense or investigation (e.g., harboring, smuggling, terrorism), the fact that an individual is suspected of being an undocumented alien shall not be the sole basis for contact, detention or arrest.
. . . .
428.3.3 ICE REQUEST FOR ASSISTANCE
If a specific request is made by ICE or any other federal agency, this department will provide available support services, such as traffic control or peacekeeping efforts, during the federal operation.
Members of this department should not participate in such federal operations as part of any detention team unless it is in direct response to a request for assistance on a temporary basis or for officer safety. Any detention by a member of this department should be based upon the reasonable belief that an individual is involved in criminal activity.
. . . .
428.3.7 NOTIFICATION OF IMMIGRATION AND CUSTOMS ENFORCEMENT
If an officer believes that an individual taken into custody for a felony is also an undocumented alien, and after he/she is formally charged

and there is no intention to transport to the county jail, ICE shall be informed by the arresting officer so that they may consider placing immigration hold on the individual.

Whenever an officer has reason to believe that any person arrested for an offense other than a felony may not be a citizen of the United States, and the individual is not going to be booked into the county jail, the arresting officer may cause ICE to be notified for consideration of an immigration hold. In making the determination whether to notify ICE in such circumstances, the officer should, in consultation with a supervisor, consider the totality of circumstances of each case, including, but not limited to:

(a) Seriousness of the offense.
(b) Community safety.
(c) Potential burden on ICE.
(d) Impact on the immigrant community.

Generally, officers will not need to notify ICE when booking arrestees at the county jail. Immigration officials routinely interview suspected undocumented aliens who are booked into the county jail on criminal charges and notification will be handled according to jail operation procedures.

**428.4 CONSIDERATIONS PRIOR TO REPORTING TO ICE**

. . . .

All individuals, regardless of their immigration status, must feel secure that contacting law enforcement will not make them vulnerable to deportation. Members should not attempt to determine the immigration status of crime victims and witnesses or take enforcement action against them absent exigent circumstances or reasonable cause to believe that a crime victim or witness is involved in violating criminal laws. Generally, if an officer suspects that a victim or witness is an undocumented immigrant, the officer need not report the person to ICE unless circumstances indicate such reporting is reasonably necessary.

SPOKANE POLICE DEP'T, POLICY MANUAL §§ 428.1-428.4, at 282-85

In October 2014, years after the Spokane Police Department adopted

Policies 402 and 428, the Spokane City Council enacted two ordinances. The

ordinances codified the department policies respectively into former SMC §§

3.10.040, .050 (2014). Until 2017 amendments, the two code sections read:

> **3.10.040 Biased Free Policing**
> . . . .
> B. Spokane Police Department Officers and all officers commissioned under the Spokane Police Department shall be prohibited from engaging in bias-based profiling.
> C. Bias-based profiling is defined as *an "act* of a member of the Spokane Police Department or a law enforcement officer commissioned by the Spokane Police Department *that relies on actual or perceived race, national origin*, color, creed, age, *citizenship status* . . . or any characteristic of protected classes under federal, state or local laws as the determinative factor initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity."
> **3.10.050 Immigration Status Information**
> A. Unless required by law or court order, no Spokane City officer or employee shall inquire into the immigration status of any person, or engage in activities designed to ascertain the immigration status of any person.
> B. Spokane Police Department officers shall have reasonable suspicion to believe a person has been previously deported from the United States, is again present in the United States, and is committ[ing] or has committed a felony criminal-law violation before inquiring into the immigration status of an individual.
> C. The Spokane Police Department shall not investigate, arrest, or detain an individual based solely on immigration status.

(Emphasis added.)

On November 26, 2014, one month after the Spokane City Council adopted former

SMC 3.10.040 and .050, Jackie Murray, on behalf of Respect Washington, submitted a petition for a proposed initiative with the Spokane city clerk. The proposed initiative would amend former SMC 3.10.040 to eliminate citizenship status from the list of prohibited factors for city police to consider during investigations, would repeal former SMC 3.10.050, and would add a new code section that would prohibit the city from limiting any city employee from collecting immigration status information and sharing the information with federal authorities. SMC 3.10.060 would read:

> Respect for Law: The City of Spokane shall not limit the ability of any city employee from collecting immigration status information, communicating immigration status information and cooperating with federal law enforcement authorities unless such regulation is approved by a majority vote of the City Council and a majority vote of the people at an election.

CP at 172.

On December 8, 2015, Jackie Murray sent two separate e-mails that declared she formally withdrew her sponsorship of the initiative petition. The Spokane County auditor continued with the initiative process anyway and certified that Murray submitted the requisite number of signatures for a vote. On February 22, 2016, the Spokane City Council placed the initiative on the November 7, 2017 ballot as Proposition 1. The *Spokesman Review* and the *Spokane Journal of Business* thereafter penned editorials lamenting the filing of an anti-immigrant initiative.

On March 27, 2017, after placement of Proposition 1 on the November 2017

11

ballot, the Spokane City Council passed Spokane Ordinance C35485, which repealed

former SMC 3.10.040 and .050, the two code sections that Proposition 1 sought to amend

or repeal.  The city council adopted the ordinance ostensibly because it wished to

consolidate various sections and chapters of the city code into a new Title 18 that

addressed human rights.  Before the creation of Title 18, the municipal code scattered

human rights provisions throughout various code sections.  Spokane Ordinance C35485

recodified similar, but not identical, language from the repealed sections into the new

Title 18.  The ordinance reads in part:

**ORDINANCE No. C35485**

An ordinance relating to human rights protections; repealing
chapters 01.06, 01.08, 10.08E, and 10.18; sections 03.10.040, 03.10.050,
and 03.10.060; enacting a new Title 18; and amending sections 01.05.210,
04.10.040 and 04.10.050 of the Spokane Municipal Code.

**WHEREAS,** human rights provisions are scattered throughout the
Spokane Municipal Code; and
**WHEREAS,** protections for human rights are fundamental to the
welfare of all people in Spokane; and
**WHEREAS,** the City Council recognizes the utility of grouping all
provisions which contain and describe the human rights protections of the
Spokane Municipal Code in the same title; and
**WHEREAS,** the City of Spokane reaffirms its commitment to the
protection of the human rights of all those living in Spokane.
**NOW THEREFORE**, the City of Spokane does ordain:

Section 1. That chapters 01.06, 01.08, 10.08E, and 10.18, and
*sections 03.10.040, 03.10.050, and 03.10.060 of the Spokane Municipal
Code are hereby repealed.*

Section 2. That there is enacted a new Title 18 of the Spokane

Municipal Code to read as follows:

**Title 18 Human Rights**
**Chapter 18.01 Law Against Discrimination**
**Section 18.01.010 Findings**
The City of Spokane finds that discrimination based on *race*, religion, creed, color, sex, national origin, marital status, familial status, domestic violence victim status, age, sexual orientation, gender identity, honorably discharged veteran or military status, *refugee status*, the presence of any sensory, mental or physical disability as defined by the Americans with Disability Act, 42 U.S.C., § 12101 et seq., and/or the Washington State Law Against Disability, Chapter 49.60 RCW, or the receipt of, or eligibility for the receipt of, funds from any housing choice or other subsidy program or alternative source of income poses a substantial threat to the health, safety and general welfare of the citizens of Spokane. The City deems it necessary and proper to enact a local ordinance to address these issues.
. . . .
**Section 18.01.030 Definitions**
. . . .
D. "Discrimination" means different or unequal treatment because of *race*, religion, creed, color, sex, *national origin*, marital status, familial status, domestic violence victim status, age, sexual orientation, gender identity, honorably discharged veteran or military status, *refugee status*, disability, the use of a guide dog or service animal, or the use or eligibility for the use of housing choice or other subsidy program or alternative source of income. "Discriminate" means to treat differently or unequally because of *race*, religion, creed, color, sex, *national origin*, marital status, familial status, domestic violence victim status, age, sexual orientation, gender identity, honorably discharged veteran or military status, *refugee status*, the presence of any sensory, mental or physical disability as defined by the American with Disability Act and/or the Washington State Law Against Discrimination, [chapter 49.60 RCW], or the use or eligibility for the use of housing choice or other subsidy program or alternative source of income.
. . . .
U. "Profiling" means actions of the Spokane Police Department, its members, or officers commissioned by the Spokane Police Department to rely on actual or perceived race, religion, national origin, color, creed, age, *citizenship status*, *immigration status*, *refugee status*, gender, sexual

orientation, gender identity, disability, socio-economic status, housing status, or membership in any protected class under federal, state or local law as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity.

V. "Refugee status" means the status of a person who, under the provisions of 8 USC 1101(a)(42), is outside a country of that person's nationality or, in the case of a person having no nationality, is outside any country in which that person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

. . . .

**Chapter 18.07 Police Practices**
**Section 18.07.010 Bias-Free Policing**

A.  The City of Spokane is committed to providing services and enforcing laws in a professional, nondiscriminatory, fair and equitable manner.

B.  *The Spokane Police Department, its officers, employees, and all officers commissioned under the Spokane Police Department are prohibited from engaging in profiling as the term is defined in this SMC 18.01*.030[U].

C.  The Spokane Police Department shall maintain policies consistent with this section.

**Section 18.07.020 Immigration Status Information**

A.  *Unless required by law or court order, no officer, agent, or employee of the City of Spokane shall inquire into the immigration or citizenship status of any person, or engage in activities designed to ascertain the immigration status of any person.*

B.  *Spokane Police officers may not inquire into the immigration or citizenship status of an individual unless they have reasonable suspicion to believe a person: (i) has been previously deported from the United States, (ii) is again present in the United States, and (iii) is committing or has committed a felony criminal law violation.*

C.  *The Spokane Police Department shall not investigate, arrest, or detain an individual based solely on immigration or citizenship status.*

D.  The Spokane Police Department shall maintain policies consistent with this section.

Spokane Ordinance C35485 (Mar. 27, 2017) (emphasis added).

PROCEDURE

In May 2017, Asian Pacific Islander Coalition-Spokane, Global Neighborhood, Refugee Connections of Spokane, Spokane Area Chapter of the National Organization of Women, Spokane Chinese American Progressives, and Spokane Chinese Association filed this lawsuit to address the validity of Proposition 1. Defendants include Spokane County Auditor Vicky Dalton, the City of Spokane, and Respect Washington. The county auditor takes no position on the merits of the suit. Respect Washington actively opposes the suit. The City of Spokane takes no position on the merits of the lawsuit, but asks that, if Proposition 1 is invalid, we enjoin its placement on the ballot. In its answer to the complaint, Spokane noted that it will pay for the cost of the Proposition 1 election, and the city did not wish to pay for an election for an invalid measure.

On July 28, 2017, Global Neighborhood moved the trial court for a declaratory judgment prohibiting Proposition 1 from being placed on the November 2017 ballot. Global Neighborhood raised at least three arguments in support of its motion for relief. Global Neighborhood claimed that Proposition 1 was invalid due to two procedural violations of the SMC. First, Proposition 1 lacked a sponsor in contravention of the Spokane Municipal Code, since Jackie Murray withdrew her sponsorship before the validation of signatures. Second, the petition for the initiative contained inflammatory and prejudicial language contrary to SMC 2.02.060(D)(5). In fact, the city clerk

15

informed Respect Washington that language in the petition conflicted with the requirements of the municipal code, and the clerk directed the group to remove the language. Respect Washington did not comply with the request. On the merits, Global Neighborhood argued that the subject matter of Proposition 1 was administrative in nature and thus not a proper subject for an initiative.

The trial court granted Global Neighborhood's request for declaratory judgment. In doing so, the trial court declared that a justiciable controversy existed, that plaintiffs held organizational standing and standing through their respective members, and that laches did not bar the suit. The superior court ruled Proposition 1 invalid because the measure seeks to repeal portions of the Spokane Municipal Code previously rescinded. The superior court also declared Proposition 1 invalid because the measure is administrative in nature and thereby exceeds the local initiative power. The trial court entered an injunction directing the removal of Proposition 1 from the November 2017 ballot.

## LAW AND ANALYSIS

The primary issue on appeal and on which our decision rests is whether Proposition 1 is administrative or legislative in nature. Nevertheless, Respect Washington raises defenses and other hurdles to Global Neighborhood obtaining relief, which defenses and arguments include laches, the statute of limitations, lack of harm for purposes of an injunction, and violation of Respect Washington's and its members First

16

Amendment rights by reason of the legal attack on Proposition 1. In turn, Global

Neighborhood asks that this court decline to address the merits of Respect Washington's

appeal because of the moot nature of the case. Global Neighborhood does not seek to

dismiss the appeal on the ground that the initiative's sponsor withdrew her sponsorship

before certification for the ballot. Since we would not need to address the merits of the

appeal if some event rendered the appeal moot, we address mootness first. We also

review, before entertaining the merits of the appeal, defenses asserted by Respect

Washington.

## Mootness

After the certification of Proposition 1 for the November 2017 ballot, the Spokane

City Council, through Spokane Ordinance C35485, repealed former SMC 3.10.040 and

.050, code sections that Proposition 1 sought to amend or repeal. Proposition 1

specifically identified the two code sections as the initiative's target. With Spokane

Ordinance C35485, former SMC 3.10.040 and .050 no longer exist. According to Global

Neighborhood, the repeal of former SMC 3.10.040 and .050 in Spokane Ordinance

C35485 renders Proposition 1 moot, because revoking or amending nonexistent code

sections serves no purpose. Global Neighborhood does not contend that the passing of

the November 2017 election leaves the initiative moot.

Global Neighborhood's contention ignores the existence of the substantive

provisions, previously found in former SMC 3.10.040 and .050, within Title 18 SMC.

17

One could read Proposition 1 as now targeting SMC 18.01.010 and .030(D), (U), and (V), SMC 18.01.040, SMC 18.07.010 and .020, which sections continue to define prohibited "profiling" as including acting on another's perceived or actual citizenship status. The new sections, like the former sections, also generally prohibit a law enforcement officer from asking a person about his or her citizenship status. Global Neighborhood's contention also ignores Proposition 1's attempt to add a new section, SMC 3.10.060, to the Spokane code. The passing of Spokane Ordinance C35485 does not render irrelevant the addition of this new section to the code by an initiative.

As a general rule, this court will not review a moot question. *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d 339, 350, 662 P.2d 845 (1983). A case is moot when it involves only abstract propositions or questions, when substantial questions in the trial court no longer exist, or when a court can no longer provide effective relief. *Spokane Research & Defense Fund v. City of Spokane*, 155 Wn.2d 89, 99, 117 P.3d 1117 (2005).

The Washington Supreme Court directs this court to consider mootness because mootness challenges the jurisdiction of the court. *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d at 350. According to our high court, the reviewing court should first address whether an issue is moot as opposed to immediately resolving the merits of an issue. *Rosling v. Seattle Building & Construction Trades Council*, 62 Wn.2d 905, 907-08, 385 P.2d 29 (1963).

18

The parties forward two conflicting Washington Supreme Court decisions on the subject of mootness within the setting of an initiative or referendum: *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d 339 (1983), and *City of Yakima v. Huza*, 67 Wn.2d 351, 407 P.2d 815 (1965). We review each decision to discern whether we should declare the validity of some or portions of Proposition 1 moot because of Spokane Ordinance C35485.

In *City of Yakima v. Huza*, chapter 5.50 City of Yakima Municipal Code imposed a tax on the gross receipts of electricity, telephone, water, sewer, and garbage utilities in the city of Yakima. In November and December 1961, the city respectively enacted Ordinances 300 and 308. The ordinances increased the permanent tax rate for the telephone utility receipts, enacted a temporary surtax for the calendar year 1962 on electricity and telephone utilities' receipts, and enacted a tax on the gross receipts for the calendar year 1962 received by the natural gas company. In April 1962, Stephen Huza filed an initiative petition with the city clerk. The proposed initiative would repeal the increased tax rates on the gross receipts of the electricity and telephone utilities, repeal the tax on the gross receipts of the natural gas company, allow tax credits on future taxes equal to all increased taxes collected under Ordinances 300 and 308 before their revocation, and reduce taxes for water, sewer, and garbage services. The initiative proposed to accomplish its purposes by expressly repealing Ordinances 300 and 308.

On July 3, 1962, the city of Yakima commenced legal action to challenge Stephen

Huza's initiative petition on the ground that only the city council held authority to amend

tax measures. On October 29, 1962, before any trial, the Yakima City Council passed

Ordinance 390 that essentially adopted the same measures as Ordinances 300 and 308,

but for the calendar year 1963. Ordinance 390 never mentioned Ordinances 300 or 308.

Ordinance 390 instead directly referenced chapter 5.50, City of Yakima Municipal Code.

On appeal, the City of Yakima argued that newly enacted Ordinance 390 rendered

moot the right to vote on Stephen Huza's proposed initiative since Ordinance 390

repealed Ordinances 300 and 308, the two ordinances the initiative sought to repeal. The

Supreme Court agreed. The Court reasoned that the proposed initiative would repeal the

tax measures implanted in Ordinances 300 and 308, but those same taxes would continue

based on Ordinance 390 despite the repeal of the earlier ordinances. The proposed

initiative could have sought to directly repeal provisions of chapter 5.50 of the municipal

code, but failed to expressly mention the code chapter. Although the initiative sought to

repeal the tax increases, the court deemed the initiative worthless because the initiative

did not mention the recently enacted ordinance number or the code sections that then

referenced the taxes. In effect, a city could renumber the ordinance or code section

sought to be repealed by an initiative in order to escape the initiative.

Three dissenters, in *City of Yakima v. Huza*, characterized the City of Yakima's

action as legislative shenanigans, a frustration of the initiative process, and a flagrant

abuse of the judicial process. We agree with the dissenters that a city should not be

allowed to enact later ordinances that readopt the same substantive measures but under different numbering or coding, in order to obstruct a proposed initiative.

In *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d 339 (1983), citizens filed a referendum with the city of Spokane city clerk, which referendum would repeal Ordinance C25792, an ordinance imposing a business and occupation tax. One month later, the Spokane City Council passed Ordinance C25832, which amended Ordinance C25792. We do not know the nature of the amendments. The clerk refused to accept the referendum based on the city attorney's advice that only the city council held authority to adopt or repeal a tax measure and the measure was administrative rather than legislative in nature. The citizens sought a writ of mandamus to compel the filing and processing of the referendum. The superior court granted the writ.

On appeal to the Supreme Court, the City of Spokane, while relying on *City of Yakima v. Huza*, argued that the proposed initiative became moot with the adoption of Ordinance C25832, which amended Ordinance C25792, the subject of the initiative. The *Citizens* court distinguished *Huza* on the basis that the later adopted Yakima ordinance was complete in itself and never referenced the two ordinances sought to be repealed by the initiative. The later adopted Spokane ordinance merely amended the earlier ordinance sought to be revoked. The later adopted Spokane ordinance did not stand alone.

21

Despite distinguishing *Huza*, the *Citizens* court wrote that it agreed with the *Huza* dissenters that a repealing or reenacting ordinance should not be allowed to frustrate the initiative process. Accordingly, the Supreme Court will frown on the deliberate efforts by a legislative body to circumvent the initiative rights of the electorate. The *Citizens* court, however, declined to reconsider *Huza* because of the differences in the effect of the respective Yakima and Spokane later adopted ordinances.

We do not know if the Spokane City Council deliberately adopted Spokane Ordinance C35485 for the purpose of evading Proposition 1. But we need not rest our decision on any deliberate evasion.

We doubt the validity of *City of Yakima v. Huza* after *Citizens for Financially Responsible Government v. City of Spokane*, but deem this appeal more aligned with the facts of *Citizens*, not *Huza*. The *Citizens* court wrote that *Huza* must be limited to its unique facts, a comment that may politely overrule *Huza*. Like the Yakima amending ordinance in *Huza*, Spokane's Ordinance C35485 is complete in itself. Nevertheless, unlike the Yakima ordinance and similar to the Spokane amending ordinance in *Citizens*, Ordinance C35485 refers to the previously enacted code sections, which are the objects of Respect Washington's initiative. Although Proposition 1 does not identify the current code sections that prohibit profiling based on and questioning about one's citizenship status, a court or a city official could deem Proposition 1 to now target code sections

found in Title 18 SMC.  Since a new ordinance should not frustrate the initiative process, we hold that the validity of Proposition 1 is not moot.

Spokane Ordinance C35485 added refugee and immigration status to citizenship status as forbidden subjects of questioning and profiling by law enforcement officers. These additions raise the problem of whether Proposition 1, if passed, would allow questioning detainees about citizenship status, but not about refugee or immigration status, despite the three statuses being interrelated.  Because we rest our decision on other grounds, we need not resolve this anomaly.

Despite the Supreme Court directing us to address mootness first because mootness impacts the jurisdiction of the courts, mootness does not necessarily preclude court review.  This court may review a moot issue of continuing and substantial interest that presents a question of a public nature likely to recur.  *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d at 351.  Washington courts have repeatedly entertained suits involving the right of initiative or referendum despite possible mootness because the suits entail substantial public interest.  *Philadelphia II v. Gregoire*, 128 Wn.2d 707, 712, 911 P.2d 389 (1996); *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d at 351; *Leonard v. City of Bothell*, 87 Wn.2d 847, 849, 557 P.2d 1306 (1976); *Save Our State Park v. Hordyk*, 71 Wn. App. 84, 89, 856 P.2d 734 (1993).  In *Citizens for Financially Responsible Government v. City of Spokane*, the high court ended its opinion by stating that, even if the appeal became

moot, it would still consider the validity of the initiative because the case presented an issue of continuing and substantial interest to the public.

The principle that mootness impacts the court's jurisdiction conflicts with the rule allowing this court to hear moot appeals impacting a substantial public interest. If we have no jurisdiction, we have no authority to hear and determine the case. *Bour v. Johnson*, 80 Wn. App. 643, 646-47, 910 P.2d 548 (1996). Nevertheless, assuming this appeal to be moot, we would proceed to the merits anyway.

Statute of Limitations

As defenses, Respect Washington asserts both the statute of limitations and the doctrine of laches. Respect Washington contends either or both should bar Global Neighborhood's request for declaratory relief. Respect Washington highlights that, on February 22, 2016, the Spokane City Council placed Proposition 1 on the November 7, 2017 ballot. Global Neighborhood did not file its complaint until more than one year later, May 1, 2017. Global Neighborhood did not file its summary judgment motion for declaratory relief until July 28, 2017.

We address first the defense of the statute of limitations. Global Neighborhood brought suit seeking a declaratory judgment. Washington's version of the Uniform Declaratory Judgments Act lacks any statute of limitations. The Supreme Court has announced that a declaratory judgment action must be brought within a reasonable time. *Automotive United Trades Organization v. State*, 175 Wn.2d 537, 541-42, 286 P.3d 377

(2012). This court has four times stated that, when assessing a reasonable period of time, we look to an analogous limitation period allowed for an appeal of a similar decision as prescribed by statute, rule of court, or other provision. *Schreiner Farms, Inc. v. American Tower, Inc.*, 173 Wn. App. 154, 159-60, 293 P.3d 407 (2013); *Cary v. Mason County*, 132 Wn. App. 495, 501, 132 P.3d 157 (2006); *Brutsche v. City of Kent*, 78 Wn. App. 370, 376-77, 898 P.2d 319 (1995); *Federal Way v. King County*, 62 Wn. App. 530, 536-37, 815 P.2d 790 (1991). The Washington Supreme Court has never adopted this principle of adoption by analogy.

Respect Washington forwards three election related statutes of limitations. A challenge to a statewide initiative or referendum ballot title must be commenced within five days. RCW 29A.72.080. The deadline for a challenge to a local ballot title is only ten days. RCW 29A.36.090. A judicial challenge of a refusal by the Washington Secretary of State to file a statewide initiative must be filed in court within ten days. RCW 29A.72.180.

Significant differences lie between a challenge to the title of an initiative and a challenge to the substance of the initiative. The initiative if adopted will take effect regardless of any defect in its title. If any lawsuit will remedy the flaw in the initiative's name, the lawsuit should be brought in advance of the election and in time for the Secretary of State or local government official to place a proper title on the ballot. A

25

challenge to a refusal to place an initiative on the ballot also should be brought quickly in order to remedy any wrongful refusal to consign the measure to the ballot.

A challenge to a local initiative as exceeding the scope of a municipality's legislative power may be brought after the initiative election. If the challenge can be brought after the vote, we should erect no impediment by reason of a statute of limitations applying before the effectiveness of the initiative as an ordinance.

We deem the preelection challenge to a ballot initiative analogous to a challenge to an adopted ordinance or statute. Under state law, no statute of limitations applies to a challenge to the constitutionality of a statute or other action. *Automotive United Trades Organization v. State*, 175 Wn.2d at 542-43 (2012); *Viking Properties, Inc. v. Holm*, 155 Wn.2d 112, 117, 118 P.3d 322 (2005); *DeYoung v. Providence Medical Center*, 136 Wn.2d 136, 146-47, 150, 960 P.2d 919 (1998). Similarly, no statute of limitations should apply to the challenge of an ordinance that exceeds the authority of the entity adopting the measure whether by its legislative body or the voters by initiative. When a plaintiff challenges the substance of an agency decision as exceeding statutory authority, no statute of limitations applies until agency action adversely impacts the plaintiff. *Aguayo v. Jewell*, 827 F.3d 1213, 1226 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 832, 197 L. Ed. 2d 69 (2017). Many Washington decisions have entertained preelection initiative challenges without suggesting a statute of limitations that applied before the election might bar such a challenge.

Laches

We move to the doctrine of laches.  Laches is an implied waiver arising from the knowledge of existing conditions and acquiescence in them.  *Buell v. City of Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972).  One who relies on a laches defense bears the burden to prove: (1) knowledge or reasonable opportunity to discover on the part of a plaintiff that he or she has a cause of action against a defendant, (2) an unreasonable delay by the plaintiff in commencing that cause of action, and (3) damage to the defendant resulting from the unreasonable delay.  *King County v. Taxpayers of King County*, 133 Wn.2d 584, 642, 949 P.2d 1260 (1997).  Damage to a defendant can arise either from acquiescence in the act about which plaintiff complains or from a change of conditions.  *Lopp v. Peninsula School District No. 401*, 90 Wn.2d 754, 759-60, 585 P.2d 801 (1978).

Generally, laches depends on the particular facts and circumstances of each case.  *Schrock v. Gillingham*, 36 Wn.2d 419, 428, 219 P.2d 92 (1950).  We regard the nature of the case to be one factor to consider when determining whether laches should be applied.  *Lopp v. Peninsula School District No. 401*, 90 Wn.2d at 759.  Other factors include the circumstances, if any, justifying the delay, the relief demanded, and the question of whether the rights of defendant or other persons, such as the public, will be prejudiced by the maintenance of the suit.  *Lopp v. Peninsula School District No. 401*, 90 Wn.2d at 759.

Laches is an extraordinary defense that is appropriately applied only when a party, knowing his rights, takes no steps to enforce them and the condition of the other party has in good faith become so changed that the party cannot be restored to his or her former state. *Ward v. Richards & Rossano, Inc.*, 51 Wn. App. 423, 435, 754 P.2d 120 (1988). Absent unusual circumstances, the doctrine of laches should not be invoked to bar an action short of the applicable statute of limitation. *In re Marriage of Capetillo*, 85 Wn. App. 311, 317, 932 P.2d 691 (1997).

Global Neighborhood contends that all three elements of laches are missing in this appeal. Global Neighborhood first contends that the record does not show that it had any knowledge of the existence of Proposition 1 until it filed suit. We reject this contention since actual knowledge is not necessary. The first element of laches extends to a reasonable opportunity to discover on the part of a plaintiff a potential cause of action. The record shows that the Spokane City Council publicly addressed the placement of Proposition 1 on the ballot. The record further shows Proposition 1 to be well publicized in the Spokane environs. The record includes editorials by the *Spokesman Review* and the *Spokane Journal of Business* ruing the anti-immigrant initiative.

Global Neighborhood waited until May 1, 2017, to file suit despite the Spokane City Council, on February 22, 2016, placing Proposition 1 on the November 2017 ballot. Global Neighborhood comments that it filed suit one month after the Spokane City Council recodified the Spokane Municipal Code's racial profiling prohibitions into other

28

sections in the code. But Global Neighborhood does not suggest that it delayed filing suit in order to determine if the city council would recodify the provisions. Global Neighborhood also lacks an explanation for delaying its challenge for more than one month after passage of Spokane Ordinance C35485. Therefore, we cannot assess the reasonableness of the delay and, for purposes of this appeal, we assume unreasonableness. Nevertheless, we find no harm to Respect Washington by reason of a delay.

Respect Washington relies on *Lopp v. Peninsula School District*, 90 Wn.2d 754 (1978), wherein the Supreme Court held that the challengers' one-month delay after the special election for a school district bond constituted an unreasonable delay. The challenger contended that the school district failed to give proper notice of a board meeting during which the board amended the title to a bond measure submitted to the voters. Nevertheless, the court found the public to have been harmed by the delay in challenging the vote approving the bond measure. The school district had received a favorable bid on the bonds, and, if the district could not accept the bid, it would need to commence the entire bond offering procedure again. The district would also lose three months of interest income, and construction plans would be delayed. The delay in construction would further exacerbate the already congested condition of classroom facilities.

Respect Washington complains that the delay in filing suit harmed it because the delay ensured that the organization could not receive appellate review of a decision prior to the November 2017 election, and, in turn, Respect Washington could not benefit by the initiative being on the 2017 ballot. Respect Washington observes that the superior court's decision was issued on August 29, 2017, one week before the September 5, 2017 deadline for the ballots to be printed.

Although we recognize Respect Washington's right to appellate review, Respect Washington cites no case that a delay in appellate review constitutes harm for purposes of laches. Also, Respect Washington's claim of harm assumes that this court would reverse the superior court's decision and allow Proposition 1 to be submitted for a vote. The claim of harm also assumes that it had the right to a vote on an initiative that exceeded the initiative power. If anything, the Spokane public is prejudiced by the expense incurred by the City of Spokane in conducting a special election for an initiative beyond the scope of the initiative power, such that this court should not dismiss the suit on laches. The claim of harm also assumes that this court lacks authority to direct placement of Proposition 1 on a later ballot.

Respect Washington's contention also fails to recognize the possibility of accelerated review by this court. Respect Washington never sought accelerated review. This court recently granted accelerated review and expeditiously issued an opinion in *In re February 14, 2017, Special Election on Moses Lake School District No. 161*

*Proposition 1*, 2 Wn. App. 2d 689, 413 P.3d 577 (2018), because of complications surrounding a vote to approve a school district bond.

Injunctive Relief

Respect Washington claims that Global Neighborhood and other plaintiff organizations lack standing to obtain an injunction enjoining the placement of Proposition 1 on the Spokane ballot. In so arguing, Respect Washington does not challenge the plaintiffs' standing to bring this suit. Respect Washington challenges whether the organizations suffered sufficient harm to gain standing for the issuance of an injunction. We are unaware of any decision that delicately slices a party's standing in this manner.

Respect Washington challenges the trial court's ruling that the plaintiffs suffered "organizational harm." Respect Washington downplays any harm suffered by the organizations in diverting resources to assist members in the event Proposition 1 passed. Respect Washington observes that someone always must change activities if an initiative passes.

Respect Washington's observation that someone always must change activities when an initiative passes because such is the nature of an initiative does little to bolster its argument that plaintiff organizations lack standing in our appeal's context. Respect Washington apparently contends that, since an initiative always impacts someone, no one deserves standing to challenge the validity of the initiative. Respect Washington fails to

31

consider that someone impacted by the initiative always has standing. The doctrine of standing generally permits someone injured or impacted by an enactment to challenge the enactment.

One who seeks relief by temporary or permanent injunction must show: (1) that he or she possesses a clear legal or equitable right, (2) that he or she has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him. *Washington Federation of State Employees v. State*, 99 Wn.2d 878, 888, 665 P.2d 1337 (1983). Because all three of these criteria must be satisfied to warrant preliminary injunctive relief, the failure to establish any one or more of the criteria dictates that we deny the requested relief. *Washington Federation of State Employees v. State*, 99 Wn.2d at 888.

All plaintiffs are organizations or associations. A nonprofit organization may represent its members in a proceeding for judicial review so long as it shows that one or more of its members are specifically injured by a governmental action. *Save a Valuable Environment v. City of Bothell*, 89 Wn.2d 862, 867, 576 P.2d 401 (1978). Organizations possess standing to assert the interests of their members, so long as the members would otherwise have standing to sue, the organization serves a purpose germane to the issue, and neither the claim nor the relief requires the participation of individual members. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011); *International Association of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d

207, 213-14, 45 P.3d 186, 50 P.3d 618 (2002). An organization also has standing in its own right with concrete and demonstrable injury to its activities caused by a drain on the organization's resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982); *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). Reading these principles together, we conclude that an organization may gain standing to sue by either an impact on its own resources or by asserting the rights of or wrongs to its members.

We conclude that at least one of the plaintiff organizations has standing on its own right and through its members. If one plaintiff has standing, the court will not address whether other challengers have standing. *Huff v. Wyman*, 184 Wn.2d 643, 649, 361 P.3d 727 (2015); *League of Education Voters v. State*, 176 Wn.2d 808, 817 n.3, 295 P.3d 743 (2013). A declaration from the chairman of the board of Refugee Connections of Spokane identifies its mission and the refugee and immigrant community the organization serves. The declaration explains how Proposition 1 will subject the organization's community of service to stops solely because of race or looks despite community members being present legally in the United States. The declaration explains that Proposition 1 will impact the organization's programs and limited resources.

In addition to holding that the plaintiff organizations possess standing, we conclude that the City of Spokane also has standing and its standing would alone allow the suit to proceed. The City of Spokane is a named defendant, not a plaintiff.

Nevertheless, Spokane sought relief from the superior court and this court. Spokane

takes no position on the merits of the challenge to Proposition 1, but the city does not

wish to incur the cost of an election for an invalid measure. Thus, the City of Spokane

asks this court, as it did the superior court, to enjoin Proposition 1 from the ballot,

assuming the initiative to be outside the scope of the local initiative power. We find no

case that bases standing on the interests of a defendant, but granting standing on such

circumstances is reasonable when the defendant, as does Spokane, seeks relief.

Case law supports a city's standing to seek an injunction precluding placing an

invalid initiative on the ballot. In *Philadelphia II v. Gregoire*, 128 Wn.2d 707 (1996), the

Supreme Court noted that preelection review of a statewide initiative was proper to

prevent public expense on measures that are not authorized by the constitution. Our court

has observed:

> We have recognized that requiring a city to place an invalid initiative
> on the ballot would result in an undue financial burden on the government.

*City of Longview v. Wallin*, 174 Wn. App. 763, 782, 301 P.3d 45 (2013).

We recognize a ruling contrary to granting Global Neighborhood standing by

Division One of this court in *American Traffic Solutions, Inc. v. City of Bellingham*, 163

Wn. App. 427, 260 P.2d 245 (2011). The court held a proposed initiative exceeded the

scope of the local initiative power. The initiative sought to prohibit the use of automated

traffic safety enforcement cameras. A state statute expressly delegated to the city

legislative authority the power to adopt such camera systems. Remarkably, the court refused to grant the initiative challengers injunctive relief to prevent a vote on the initiative. The court reasoned that the challengers were not injured by the adoption of the initiative because its adoption would be void.

*American Traffic Solutions, Inc. v. City of Bellingham* may be distinguished from *City of Longview v. Wallin* in that the challenger in *Wallin* was the city who needed to incur the expense of the ballot election. Nevertheless, we consider *American Traffic Solutions, Inc.* contrary to other decisions and principles of standing.

Free Speech

In response to Global Neighborhood's lawsuit, Respect Washington argues that Global Neighborhood's preelection action attempt to invalidate Proposition 1 breaches its and its members' right to free speech and redress from the government as protected by both the United States and Washington Constitutions. Respect Washington relies on *Coppernoll v. Reed*, 155 Wn.2d 290, 119 P.3d 318 (2005) for the proposition that substantive preelection review may unduly infringe on free speech values.

In *Coppernoll v. Reed*, our Supreme Court examined whether and under what circumstances preelection review of a *statewide* initiative violated article II, section 1(a) of the Washington Constitution, which provides the power of initiative to Washington citizens. In considering this issue, the court delineated three distinct and separate categories of preelection challenges. The Supreme Court categorized challenges to

statewide initiatives and then determined which categories suffice for a preelection

challenge. In so doing, the court observed:

> Because ballot measures are often used to express popular will and
> to send a message to elected representatives (regardless of potential
> subsequent invalidation of the measure), substantive preelection review
> may also unduly infringe on free speech values.

*Coppernoll v. Reed*, 155 Wn.2d at 298. Nevertheless, the Supreme Court announced no

rule that proponents of initiatives hold a First Amendment right to the advancement of the

initiative to the ballot box. Instead, the court recognized the validity of preelection

challenges under some circumstances.

In *City of Longview v. Wallin*, 174 Wn. App. 763 (2013), this court rejected a First

Amendment argument identical to the one raised by Respect Washington in this appeal.

Mike Wallin sponsored a local initiative proposing restrictions on the use of traffic safety

cameras. The superior court granted the city's declaratory judgment request to withhold

the initiative from the ballot because the initiative exceeded the scope of the local

initiative power. On appeal, Wallin argued the trial court's ruling violated his First

Amendment rights, and he similarly relied on the sentence from *Coppernoll v. Reed* for

support. This court deemed Wallin's reliance on *Coppernoll* unpersuasive, particularly

because the initiative in *Coppernoll* was a statewide initiative, whereas the initiative

sponsored by Wallin was a local initiative. The local initiative power does not derive

from our state constitution; rather, a statute authorizes this power. The constitutional

preeminence of the right of initiative discussed in *Coppernoll* does not enjoy the same

vigilant protection with respect to municipal initiatives.  This court also limited Wallin's

First Amendment right to free speech to the gathering of signatures on his initiative

petition.  The right did not extend to placing the initiative on the ballot.

In *Port of Tacoma v. Save Tacoma Water*, 4 Wn. App. 2d 562, 422 P.3d 917

(2018), this court recently again addressed a First Amendment argument in favor of

placing a local initiative on the ballot.  The proponents of an initiative to limit the

availability of a municipality's water service contended that the removal of the initiative

from the ballot violated its right to free speech under the First Amendment of the United

States Constitution and article I, sections 4 and 5 of the Washington Constitution.  This

court observed that the United States Supreme Court held that the circulation of an

initiative petition involves the type of interactive communication concerning political

change that entails core political speech.  Nevertheless, barring an initiative from the

ballot does not violate the constitution when the initiative lies outside the scope of the

local initiative's power.

Other courts have rejected a constitutional right to place an initiative or

referendum on the ballot.  *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012); *State ex

rel. Bolzenius v. Preisse*, 2018-Ohio-3708, ___ N.E.3d ___ (Sept. 14, 2018).  This

rejection follows the principle that a state may entirely decline to grant a right to legislate

through ballot initiatives. *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 n.7 (9th Cir. 2003).

Validity of Proposition 1

We move to the merits of the appeal and address the validity of Proposition 1. This appeal concerns a municipality's proposed initiative. The law treats a statewide initiative different from a local government initiative. *Protect Public Health v. Freed*, No. 95134-9 (Wash. Dec. 6, 2018), http://www.courts.wa.gov/ Opinions/ pdf/951349.pdf; *Coppernoll v. Reed*, 155 Wn.2d at 297 (2005); *City of Longview v. Wallin*, 174 Wn. App. at 790 (2013); *Philadelphia II v. Gregoire*, 128 Wn.2d at 712 (1996). The Seventh Amendment to the Washington State Constitution establishes the people's right to statewide initiative, and the courts interpret this power broadly to favor this right. *Coppernoll v. Reed*, 155 Wn.2d at 297.

Our constitution does not extend the initiative or referendum power to cities, but the legislature has enacted enabling legislation authorizing municipal initiatives and referenda. *City of Longview v. Wallin*, 174 Wn. App. at 791. The Washington Legislature granted charter cities the opportunity to afford city voters the initiative process. RCW 35.25.200. The City of Spokane exercised this privilege in sections 81 and 82 of the Spokane City Charter. CITY OF SPOKANE CHARTER §§ 81, 82.

Global Neighborhood filed suit before Spokane residents could vote on Proposition 1. The law disfavors judicial preelection review of initiatives. *Protect*

38

*Public Health v. Freed*, No. 95134-9 at 463; *Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*, 185 Wn.2d 97, 104, 369 P.3d 140 (2016). Courts will, however, review, before the election, a local initiative to determine whether the proposed law exceeds the scope of the initiative power. *Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*, 185 Wn.2d at 104. Washington courts more readily bar a local government initiative or referendum, than a state initiative or referendum, from the ballot box since the state constitution authorizes such state ballot measures.

No constitutional or statutory provision expressly limits the scope of local government initiative in Washington State. Neither the Spokane City Charter nor the Spokane Municipal Code explicitly imposes restrictions on the subject of an initiative. Nevertheless, case law impresses at least three restraints on a local initiative. First, the initiative must be "legislative," not "administrative," in nature. Second, the initiative may not interfere with state or federal law. *Coppernoll v. Reed*, 155 Wn.2d at 297 (2005). Third, the law must grant the municipality as a whole, rather than a board or council of the municipality, the power to adopt the provision. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006). With regard to these restrictions on citizen rights, a referendum is no different from an initiative, and we treat decisions involving referenda the same in our discussion.

A court may strike the initiative from the ballot if the initiative violates any of the three limitations. Global Neighborhood relies on the first and second bases. We base our decision on the distinction between administrative and legislative measures.

A city council or a county commission, unlike the state legislature, exercises executive and quasi-judicial functions in addition to legislative functions. *Margolis v. District Court*, 638 P.2d 297, 303 (Colo. 1981). At the same time, the power of the people to enact ordinances by initiative or referendum implicates only the legislative power of the municipality. Thus, the majority American rule permits ballot initiatives or referenda only with regard to acts legislative in temperament. *City of Aurora v. Zwerdlinger*, 194 Colo. 192, 571 P.2d 1074, 1076 (1977). Otherwise ballot initiatives could bring the machinery of government to a halt. *City of Aurora v. Zwerdlinger*, 571 P.2d at 1076.

The right to act directly through referendum or initiative is not an inherent power of the people. *Ballasiotes v. Gardner*, 97 Wn.2d 191, 195-96, 642 P.2d 397 (1982). Under our state constitution, municipal governments are not fully sovereign and derive their authority to utility the initiative process from statute, rather than the constitution. *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d 1, 8, 239 P.3d 589 (2010).

RCW 35.22.200 declares, in part:

> The *legislative powers* of a charter city shall be vested in a mayor and a city council, to consist of such number of members and to have such powers as may be provided for in its charter. The charter may provide for

> direct *legislation* by the people through the initiative and referendum upon
> any matter within the scope of the powers, functions, or duties of the
> city. . . .

(Emphasis added.)  In conformance with the statute, Washington case law limits the local

initiative power to legislation or "legislative matters" within the authority of the city.

*Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*, 185 Wn.2d at

107.  In turn, the case law distinguishes between "legislative" and "administrative"

measures and precludes administrative matters as the subject of an initiative or

referendum.  *Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*,

185 Wn.2d at 107.

When drawing a distinction between administrative and legislative measures, the

Washington Supreme Court, like other state high courts, has adopted two tests entailing

various factors enumerated in the leading treatise, Eugene McQuillin's The Law of

Municipal Corporations.  *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d at

11 (2010); *Heider v. City of Seattle*, 100 Wn.2d 874, 875-76, 675 P.2d 597 (1984);

*Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d at 347

(1983); *Ballasiotes v. Gardner*, 97 Wn.2d at 195-96 (1982); *Seattle Building &*

*Construction Trades Council v. City of Seattle*, 94 Wn.2d 740, 748, 620 P.2d 82 (1980);

*Ruano v. Spellman*, 81 Wn.2d 820, 823-24, 505 P.2d 447 (1973); *Leonard v. City of*

*Bothell*, 87 Wn.2d at 850-51 (1976); *Durocher v. King County*, 80 Wn.2d 139, 152-53,

492 P.2d 547 (1972).  The latest revision of the McQuillin treatise, from 2013, reads in

41

relevant part:

> Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative. In this connection an ordinance which shows an intent to form a permanent rule of government until repealed is one of permanent operation. Obviously, details which are essentially of a fluctuating sort, due to economic or other conditions, cannot be set up in and by an ordinance to be submitted to the vote of the people.
>> The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it. Similarly, an act or resolution constituting a declaration of public purpose and making provision for ways and means of its accomplishment is generally legislative as distinguished from an act or resolution which merely carries out the policy or purpose already declared by the legislative body. In applying the "legislative" versus "administrative" test distinguishing on the basis of "new policy or plan" versus "pursuit of plan already adopted," the court will apply a liberal rule of construction so that, for example, a resolution approving an annexation has been construed as municipal legislation in that it was characterized as a new law to which referendum powers apply. The distinction between "legislative" and "administrative" matters is the distinction between making laws of general applicability and permanent nature, on the one hand, as opposed to decisions implementing such general rules, on the other.
>> . . . .
>> Whether a particular municipal activity is administrative or is legislation often depends not on the nature of the action but the nature of the legal framework in which the action occurs.

5 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 16.53 (3d ed. 2013)

(footnotes omitted).

This excerpt from § 16.53 begs several questions, some of which loom important in our analysis of the validity of Proposition 1. What if the subject of the initiative is permanent but limited, not general, in character? Where lies the dividing line between an action general in nature and specific in character? Is an act general in nature because it applies throughout the entire geographic boundaries of the municipality and limited when only applying to certain neighborhoods? Or is the act general in nature if it applies to all persons despite a limited geographical reach and limited if it applies only to a subset of persons? Is the act administrative in nature if it applies only to the conduct of municipal employees? If the initiative proposes to reverse recent law does it create new law? If the initiative proposes to reverse a recent ordinance does it create new law even if the initial ordinance was administrative in nature? What if the initiative has some characteristics of an administrative action and some attributes of a legislative act?

Some principles announced in Washington cases partially answer these questions. In distinguishing between administrative and legislative proposals, we look at the fundamental and overriding purpose of the initiative, rather than mere incidentals to the overriding purpose. *Coppernoll v. Reed*, 155 Wn.2d at 302 (2005). An initiative is administrative in nature if it hinders or furthers a plan the local government, or some power superior to it, has previously adopted. *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d at 11. An initiative may be administrative in nature if it conflicts with state law's directions to government employees or entities. *Seattle Building &*

43

*Construction Trades Council v. City of Seattle*, 94 Wn.2d at 749 (1980).

The most learned treatment of the difference between administrative and legislative municipal actions comes from the Kansas Supreme Court. *City of Wichita v. Kansas Taxpayers Network, Inc.*, 255 Kan. 534, 874 P.2d 667 (1994); *City of Lawrence v. McArdle*, 214 Kan. 862, 522 P.2d 420 (1974). The Kansas high court recognizes that whether a proposed initiative is legislative or administrative is often a difficult question to answer in part because no single act of a governing body is solely legislative or administrative. *McAlister v. City of Fairway*, 289 Kan. 391, 212 P.3d 184, 193-94 (2009). The question can be fact specific. *McAlister v. City of Fairway*, 212 P.3d at 194. No one factor necessarily controls over the others. *McAlister v. City of Fairway*, 212 P.3d at 195. The court will give consideration to each factor before reaching a final decision. *McAlister v. City of Fairway*, 212 P.3d at 195. But in doing so, the weight given to any one factor may be enough under a particular factual situation to decide that a proposed ordinance intrudes too far into a city's administrative arena and thereby becomes administrative in nature. *McAlister v. City of Fairway*, 212 P.3d at 195.

In addition to the traditional factors of general or specific and creating or implementing policy, the Kansas high court added the technical nature of the proposal as another consideration. *McAlister v. City of Fairway*, 212 P.3d at 194. A decision that requires specialized training and experience in municipal government and intimate knowledge of the fiscal and other affairs of a city in order to make a rational choice

44

should be deemed administrative, even though the choice may entail some characteristics

of establishment of policy. *McAlister v. City of Fairway*, 212 P.3d at 194.

The Washington Supreme Court, without expressly adopting the specialized

complexion of a municipal ordinance or initiative as a factor, commented on the technical

nature of a measure in *Leonard v. City of Bothell*, 87 Wn.2d 847 (1976). The Supreme

Court declared as administrative a proposed referendum on a municipal ordinance that

would rezone property from agricultural to community business and would modify the

city's comprehensive plan to allow a regional shopping center. The court observed:

> Amendments to the zoning code or rezone decisions require an informed and intelligent choice by individuals who possess the expertise to consider the total economic, social, and physical characteristics of the community. Respondent's planning commission and city council normally possess the necessary expertise to make these difficult decisions. The State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, emphasizes this need for carefully planned land-use decisions. . . . SEPA requires a sophisticated understanding of the environmental problems of the project.

*Leonard v. City of Bothell*, 87 Wn.2d at 854.

We now analyze the complexion of Proposition 1. In doing so, we consider

Proposition 1 as repealing or modifying the earlier sections of the Spokane Municipal

Code, former SMC 3.10.040, .050, which addressed the same subject matter, the

questioning by police of an individual's immigration and citizenship status. We

recognize that current Spokane policy allows a law enforcement officer to question a

suspect about his or her immigration status, but limits the circumstances under which a

police officer may question an individual as to the individual's immigration status,

citizenship status, or refugee status. The officer may question about status if the officer

holds reasonable suspicion that the person was previously deported from the United

States and is committing or has committed a felony. Current Spokane law and policy

limits the circumstances under which a police officer should forward immigration status

information to the United States Immigration and Customs Enforcement Agency.

Proposition 1 removes any restrictions on any officer or other employee of Spokane to

question one about his or her immigration status or to forward immigration status

information to others.

We recognize at least one characteristic of Proposition 1 in common with

legislative acts. Proposition 1 adopts a rule of government permanent in nature. An

initiative showing an intent to form a standing rule of government, until it is repealed, is

one of permanent operation. *McAlister v. City of Fairway*, 212 P.3d at 196.

Respect Washington argues that Proposition 1 is legislative in nature because of

the additional feature that the initiative seeks to reverse or change city policy. Respect

Washington also contends that, although the subject matter at issue originated as Spokane

Police Department policy, the adoption of the policy by the Spokane City Council

transformed the policy from administrative in nature to legislative in nature.

Respect Washington analogizes to *Citizens for Financially Responsible*

*Government v. City of Spokane*, 99 Wn.2d at 347 (1983), in which citizens wished to

repeal a business tax after the city council enacted the tax. When conducting the administrative versus legislative analysis, the Washington Supreme Court analyzed whether the original ordinance, rather than the citizens' referendum, was administrative. The court concluded that the city ordinance was legislative in nature and subject to referendum. In reaching this conclusion, the court noted that the city ordinance could not be viewed as an execution of policy already in existence. Rather, the tax ordinance set a new policy. The Supreme Court did not expressly avow that an initiative that revokes an ordinance legislative in nature also renders the initiative legislative in nature, the court ruling implies such. Thus, we agree with Respect Washington that Proposition 1, assuming the underlying former SMC 3.10.040 and .050 to be legislative, maintains some legislative character in that the initiative modifies, if not reverses in part, legislative policy established by the city council.

Other characteristics of Proposition 1 share features in common with administrative acts. SMC 3.10.010(B)(1) delegates to the Spokane Police Department police chief authority to issue rules for the proper functioning of the police department. The Spokane City Council did not adopt former SMC 3.10.040 and .050 in a vacuum. The Spokane Police Department had already adopted standing policies with regard to questioning individuals about immigration and citizenship status. The Spokane City Council, when adopting former SMC 3.10.040 and .050, merely codified existing police department policy.

47

We recognize the argument that, if the city council adopts a department's administrative policy, the policy transforms into a legislative policy. Nevertheless, no case law supports that contention. If other actions by the city legislative body constitute administrative action, the adoption of a city department's administrative regulations can remain administrative in character. When analyzing the legislative or administrative nature of a municipal act, courts consider the framework of the action. Proposition 1 challenges a Spokane policy, whose framework's base consists of administrative building blocks.

Proposition 1 interferes with Spokane Police Department policy to limit the circumstances under which law enforcement officers inquire about immigration and citizenship status. To repeat, an initiative is administrative in nature if it hinders or furthers a plan the local government previously adopted. *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d at 11. Proposition 1 hinders a policy previously adopted by the local government similarly to the proposed initiative that interfered in the building of the King County stadium in *Ruano v. Spellman*, 81 Wn.2d 820 (1973).

We recognize that the state Supreme Court, in *State ex rel. Pike v. City of Bellingham*, 183 Wash. 439, 48 P.2d 602 (1935), held the fixing of salaries of firefighters and police officers to be legislative in nature. One might argue that the decision suggests that administrative affairs of a police department may be legislative in nature.

Nevertheless, the city of Bellingham measure did not directly impact how to administer services provided by the police department.

We are unaware of any decision that expressly holds that directions to employees constitute administrative, not legislative, policy. Nevertheless, logic supports such a conclusion. Directions to government employees may come from a legislature but generally derive as administration actions by department heads.

We observe that the language in former SMC 3.10.040 and .050, in their code section replacements at SMC 18.07.010 and .020, and in Proposition 1 lack any declaration of policy. McQullin on Municipal Corporations and impliedly *Ballasiotes v. Gardner*, 97 Wn.2d 191 (1982) state that a declaration of policy, or the lack of a declaration of policy, influences the action as being respectively legislative or administrative in nature. Since a declaration of policy generally functions as a formality, we deem this factor of limited assistance. Still, the lack of a declaration of policy in our operative ordinances and Proposition 1 bolsters our conclusion.

In addition to relying on Proposition 1 countering a Spokane Police Department policy, we emphasize the need for expertise on the challenging and charged question of whether local government agents should question individuals about immigration or citizenship status. United States legislative policy dictates the removal of those illegally in the United States, and the federal government operates an agency and a separate court system to fulfill this dictate. If and when a local law enforcement agency seeks to

question an individual as to his or her legal status inside the nation's borders involves a different query. Case law and literature recognizes the need to weigh conflicting goals before establishing a policy of asking or withholding questioning regarding one's citizenship status. Local law enforcement agencies must also navigate constitutional protections afforded residents before asking for information on one's status. These factors implicate the success of law enforcement efforts and thus questioning should be reserved to the expertise of law enforcement administrators.

We discern from its name that Respect Washington seeks respect for all law, including immigration laws and laws demanding deportation of those unlawfully within the United States, including within the city of Spokane. Respect for all law is a noble standard and deporting those unlawfully in the nation a legitimate end to this principle. But a law enforcement agency that allows officers free reign in questioning anyone as to his or her citizenship status, such as proposed in Proposition 1, can encounter negative side effects from such a policy.

Proposition 1 allows city of Spokane employees to collect information on immigration status. The collection of data assumes the right to question individuals of their status. Proposition 1 provides no limits on when a law enforcement officer, or for that matter any employee of the city of Spokane, can question others about citizenship status. Spokane Police Department policy and Spokane city ordinances already allow police officers to question those reasonably suspected to be committing a crime by

returning to the United States unlawfully after being deported. If law enforcement officers can already question those for whom probable cause of this federal felony exists, one wonders under what circumstances city employees will seek information from other city residents about their status when no probable cause exists. We do not expect law officers to ask everyone encountered as to his or her status. Our extensive reading of literature and case law teaches, however, that, without any guidelines, some officers will inevitably target those persons who look foreign or speak a different language, regardless of citizenship, for questioning. The practice of questioning some and not others leads to racial profiling. During oral argument, Respect Washington agreed that asking one his or her immigration status or citizenship status can be racial profiling under some circumstances. Wash. Court of Appeals oral argument, *Global Neighborhood v. Respect Washington*, No. 35528-4-III (Oct. 23, 2018), 34.55 to 35.15 (on file with court).

As noted in *Parada v. Anoka County*, 332 F. Supp. 3d 1229 (D. Minn. 2018):

> A substantial number of Latinos−both U.S. citizens and foreign-born residents—are less likely to contact the police or report crimes, even when they are victims, because they fear that police will inquire about their immigration status. While the U.S. immigrant population is extremely vulnerable to crime, police mistrust is common within immigrant communities. In Minnesota, law-enforcement agencies fear that the immigrant community's distrust of police results in increased crime against immigrants and decreased reporting of such crimes.

332 F. Supp. 3d at 1235-36 (footnotes omitted) (citing NIK THEODORE, INSECURE COMMUNITIES: LATINO PERCEPTIONS OF POLICE INVOLVEMENT IN IMMIGRATION

51

ENFORCEMENT 5-6 (2013); Mai Thi Nguyen & Hannah Gill, *Interior Immigration Enforcement: The Impacts of Expanding Local Law Enforcement Authority*, 53 URB. STUD. 14-16 (Feb. 2016); Jill T. Messing, et al., *Latinas' Perception of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc'y. 328, 330 (2015); INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, POLICE CHIEFS GUIDE TO IMMIGRATION ISSUES 28 (2007); Sam Torres & Ronald E. Vogel, *Pre and Post-Test Differences Between Vietnamese and Latino Residents Involved in a Community Policing Experiment: Reducing Fear of Crime and Improving Attitudes Towards the Police*, 24 POLICING: INTERNATIONAL J. POLICE STRAT. & MGMT. 40, 53 (2001)).

A police chief or sheriff deputy deserves the opportunity to adopt administrative policies deemed best for his or her jurisdiction in combatting crime, protecting victims, and allocating limited law enforcement resources. One city police department, in furtherance of an administrative policy of strict enforcement of all law, may liberally direct its officers to question about immigration status. Another city police department, pursuant to other legitimate law enforcement concerns, may direct its line officers to strictly limit questioning of citizenship status. The populace and law enforcement sometimes criticize persnickety courts and the legislature for micromanaging methods of law enforcement. Proposition 1 would further micromanagement.

Washington case law recognizes as a separate exception to the power of a local

government, to adopt an initiative, a proposal that conflicts with federal or state law. *Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*, 185 Wn.2d at 108; *Coppernoll v. Reed*, 155 Wn.2d at 299; *Seattle Building & Construction Trades Council v. City of Seattle*, 94 Wn.2d at 746 (1980). This rule fulfills the principle of primacy of federal and state over local law. Nevertheless, sometimes the separation between this exception borne of conflict of law blurs with the exception based on administrative measures or policies. Administrative acts include acts that result from governmental powers properly assigned to the executive department and necessary to carry out legislative policies and purposes already devolved on a municipal body by the law of the state. *In re Referendum Petition to Repeal Ordinance 04-75*, 388 N.J. Super. 405, 908 A.2d 846, 850 (2006), *aff'd* [and judgment modified], 192 N.J. 446, 931 A.2d 595 (2007). When a municipal government complies with and places into execution a state or local legislative mandate in adopting an ordinance, the municipality exercises a ministerial and administrative function not subject to referendum. *In re Referendum Petition to Repeal Ordinance 04-75*, 908 A.2d at 851. Therefore, if a proposed initiative covers a direction from state law but conflicts with that direction, the initiative might also be considered administrative in nature.

As indicated in the opening of the factual section, RCW 43.101.410 precludes law enforcement agencies from racial profiling. Racial profiling of any kind is anathema to our criminal justice system. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir.

53

2001). Global Neighborhood also forwards RCW 10.40.200(1), which prohibits the collection and dissemination of immigration information during the plea stage of a criminal proceeding. Proposition 1 would place city employees, such as city prosecutors and public defenders, in a situation that conflicts with the statute.

The current Spokane Police Department policy limiting questioning of individuals about immigration status and citizenship status also fulfills strictures of federal law. Under federal constitutional law, an officer may not rely solely on the appearance of an individual in questioning about immigration status. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131-32 (9th Cir. 2000). Instead questioning must be based on individual suspicion. *United States v. Montero-Camargo*, 208 F.3d at 1133. Proposition 1 would allow an officer to approach anyone of his or her choosing on the street and ask the person as to his or her immigration or citizenship status.

A law enforcement officer does not breach the Fourth Amendment when the officer's questioning of a detainee's immigration status does not prolong the stop. *Muehler v. Mena*, 544 U.S. 93, 101, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005). Nevertheless, a law enforcement officer violates one's rights by delaying one's release from a stop in order to ascertain the detainee's immigration status. *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). One wonders how a law enforcement officer can inquire about one's immigration status without prolonging the stop when inquiring about the status necessarily prolongs the detainment.

An individual's race, standing alone, is not an appropriate factor for assessing reasonable suspicion in the immigration enforcement setting. *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir. 1991). An individual's difficulty in speaking English also does not constitute a valid race-neutral basis for initiating an immigration investigation. *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d 523, 539 (6th Cir. 2002). The Equal Protection Clause prohibits a police officer from selecting one for a consensual interview solely on the basis of the person's race. *Farm Labor Organizing Committee v. Ohio State Highway Patrol*, 308 F.3d at 539.

## CONCLUSION

We affirm the superior court's grant of an injunction precluding the placement of Proposition 1 on the ballot for a vote by Spokane voters.

Fearing, J.

WE CONCUR:

Korsmo, J.

Siddoway, J.

APPENDIX

We list in reverse chronological order and tersely discuss Washington cases that address the validity of an initiative and that inform our decision.

In *Protect Public Health v. Freed*, No. 95134-9 (Wash. Dec. 6, 2018), the Supreme Court held that a proposed initiative to ban public funding for community health engagement sites went beyond the scope of the local initiative power. The sites would afford a safe location for injecting drugs. The initiative interfered with the budgetary authority of the King County Council. RCW 36.40.080 and .250 granted to the county council the authority to fix each item of the budget. RCW 70.12.025 directed each county legislative authority to annually budget and appropriate sums for public health.

In *Port of Tacoma v. Save Tacoma Water*, 4 Wn. App. 2d 562 (2018), a political committee submitted two initiative petitions. One initiative proposed an amendment to the Tacoma City Charter and the other sought to enact a new municipal ordinance. The two initiatives contained similar text that would require a vote of Tacoma residents before the city extended water service to applicants seeking at least one million gallons of water daily. Corporations that violated the provisions would be deemed nonpersons. The Court of Appeals denied the measure a vote on the basis that the proposition was administrative and conflicted with state law. The Tacoma Municipal Code already outlined a process for applications for water service. The initiative would impose

56

additional application requirements on certain large users. A state statute required that a municipal water supplier provide retail water service under certain conditions. The initiative would deny service to some potential customers under additional circumstances.

In *Spokane Entrepreneurial Center v. Spokane Moves to Amend Constitution*, 185 Wn.2d 97 at 101, 110 (2016), the state high court held a local measure that would require any proposed zoning changes involving large developments to be approved by voters to be contrary to established water rights system and thus administrative. The court declared the initiative invalid.

*City of Longview v. Wallin*, 174 Wn. App. 763 (2013), the city brought an action for a declaration that the ballot initiative proposing restrictions on the use of traffic safety cameras was beyond the scope of the local initiative power. This court agreed. A state statute expressly delegated to the city legislative authority, rather than the city as a whole, the power to adopt such camera systems.

In *American Traffic Solutions, Inc. v. City of Bellingham*, 163 Wn. App. 427 (2011), this court held a proposed initiative exceeded the scope of the local initiative power. The initiative sought to prohibit the use of automated traffic safety enforcement cameras. A state statute expressly delegated to the city legislative authority the power to adopt such camera systems. Remarkably, the court refused to grant the initiative challengers injunctive relief to prevent a vote on the initiative. The court reasoned that

the challengers were not injured by the adoption of the initiative because its adoption would be void. This decision might be distinguished from *City of Longview v. Wallin* in that the challenger in *Wallin* was the city who needed to incur the expense of the ballot election.

In *City of Port Angeles v. Our Water-Our Choice!*, 170 Wn.2d 1 (2010), the Supreme Court declared an initiative attempting to reverse implementation of a city water fluoridation program to be administrative. The court emphasized that the city council's decision to fluoridate potable water was made pursuant to an existing water management plan and detailed state administrative regulations governing water. Both state and federal government promulgated water regulations.

In *Futurewise v. Reed*, 161 Wn.2d 407, 166 P.3d 708 (2007), challengers sought declaratory and injunctive relief to prohibit the Washington Secretary of State from placing, on the general election ballot, Initiative 960 (I-960), which if enacted would amend state statutes to require two-thirds legislative approval or voter approval for the raising of taxes. The initiative would also require advisory votes on tax increases enacted without voter approval. The Supreme Court denied relief. A unanimous court held that the initiative was not subject to preelection review on the ground that, if enacted, it would conflict with, and therefore improperly "amend," the state constitution without complying with procedures for amending the state constitution.

In *City of Sequim v. Malkasian*, 157 Wn.2d 251 (2006), the Supreme Court precluded placement on the ballot an initiative that would impose additional requirements on revenue bonds. The pertinent statutory scheme assigned authorization for issuing revenue bonds to the city council.

In *Coppernoll v. Reed*, 155 Wn.2d at 293 (2005), the Supreme Court addressed a statewide initiative that would restrict noneconomic damages in claims for negligent healthcare to $350,000, shorten time limits for filing suit, and limit attorney fees for claimants. Challengers to the initiative claimed the initiative to be unconstitutional under settled Washington law. The court refused to address the constitutionality of the initiative. The court also deemed the initiative to be within legislative powers in that it addressed a general subject matter that being causes of action and the practice of law.

In *Maleng v. King County Corrections Guild*, 150 Wn.2d 325, 76 P.3d 727 (2003), the King County prosecutor filed suit to enjoin the placement on the ballot of a proposed initiative to reduce the size of the county council. The court held the process of amending a city charter to be legislative in character and thus subject to an initiative.

In *Priorities First v. City of Spokane*, 93 Wn. App. 406, 968 P.2d 431 (1998), a political action committee petitioned for a writ of mandamus directing the city of Spokane to place on the ballot an initiative that would require the city to obtain voter approval before pledging parking meter revenue to fund a parking garage. This court

59

denied relief because the initiative conflicted with the authority delegated by state statute to a city's legislative body.

In *Snohomish County v. Anderson*, 123 Wn.2d 151, 868 P.2d 116 (1994), the court stopped an initiative that would impact a county's planning scheme. The court observed that RCW 36.70A.210(2) authorized the county legislative authority to adopt countywide planning policy.

In *Heider v. City of Seattle*, 100 Wn.2d at 876 (1984), the Supreme Court held a proposed change of a city street name to be administrative in nature and thus not a proper subject for an initiative. The court deemed the first test of legislative versus administrative helped little since a street name change is of a permanent character and not general in character. Also, the change could be deemed as "'special'" but not "'temporary.'" The second test helped, however. The name change ordinance merely amended Seattle's comprehensive street names ordinance. Therefore, the ordinance should be characterized as administrative, since it was enacted pursuant to a plan already adopted by the legislative body itself.

In *Citizens for Financially Responsible Government v. City of Spokane*, 99 Wn.2d 339 (1983), the city passed an ordinance enacting a business and occupation tax. Through a referendum, city citizens sought repeal of the tax. When conducting the administrative versus legislative analysis, the court analyzed whether the original

ordinance enacting the tax was administrative. The court did not analyze, as most other case law does, whether the citizens' referendum was administrative in nature. The court ultimately concluded that the city ordinance was legislative in nature and subject to referendum. In reaching this conclusion, the court noted the city ordinance could not be viewed as an execution of policy already in existence. Rather, the court viewed the ordinance as setting a new policy. The ordinance never referenced a policy already in existence.

In *Ballasiotes v. Gardner*, 97 Wn.2d 191 (1982), Pierce County adopted an ordinance that converted the existing lever machine voting equipment to punch card and computer tabulating voting equipment. The ordinance affirmed a previous decision made by the executive power of the county to change to a punch card system. Nevertheless, the county council ordinance declared it to be the policy of the county to implement the punch card system. Citizens sought a referendum to return the county to the lever machine system. The Supreme Court held the measure to implement a punch card voting system to be "legislative" in character and referendable. Affirming an executive decision did not render the decision administrative. The court also held that the act of funding the new punch card system was legislative in character.

In *Seattle Building & Construction Trades Council v. City of Seattle*, 94 Wn.2d 740 (1980), the Supreme Court held that a proposed city initiative that sought to prohibit

expansion of Interstate 90 facilities on a lake went beyond the scope of the initiative power. A state statute declared the interstate highway a state route. The State held title to the highway and assumed full jurisdiction, responsibility, and control of the roadway. A city held power over a state highway only to the extent authorized by the state legislature. Thus, any such powers constituted administrative powers.

In *Leonard v. City of Bothell*, 87 Wn.2d 847 (1976), citizens sought to compel a referendum election on a municipal ordinance that would rezone property from agricultural to community business and would modify the city's comprehensive plan to allow a regional shopping center. The Supreme Court held that the ordinance was administrative in nature and not subject to referendum election. The municipality acts in a legislative capacity when adopting a zoning code and a comprehensive plan, but in an administrative capacity when enacting amendments to the zoning code or rezones and amendments to the comprehensive plan because the municipality then implements the earlier plans. Also, a rezone is quasi-judicial in character and thus not subject to a referendum. Finally, under statute the legislature granted to the city council, not the municipality as a whole, the power to adopt and implement zoning.

In *Ruano v. Spellman*, 81 Wn.2d at 825 (1973), the King County Council voted to build a county stadium and sold bonds to finance the construction. Citizens filed an initiative to repeal the resolution authorizing the project, to revoke the bonds to finance it,

and to prohibit spending funds for further development. The Supreme Court noted that, while the original decision to build the stadium was legislative, all that remained was for the county and its agents to execute an already adopted legislative determination. Under these facts, the court held only administrative decisions remained in connection with the stadium project, decisions not subject to the initiative process.

In *State ex rel. Guthrie v. City of Richland*, 80 Wn.2d 382, 494 P.2d 990 (1972), the city of Richland adopted an ordinance that extended its water and sewer system to annexed land and issued bonds to pay for the extension of the system. Citizens then sought a referendum to overturn the ordinance, but the city clerk refused to validate the petitions for the referendum. The Supreme Court denied a writ of mandamus directing the city to submit the referendum to a vote. The court held that an ordinance providing for additions, betterments, and extensions to a municipally owned waterworks, financed by revenue bonds, was not subject to a referendum vote. A statute delegated to the governing body of the city the authority to construct and finance a sewer and water works.

In *Durocher v. King County*, 80 Wn.2d 139 (1972), the King County Council granted companies an unclassified use permit with conditions for a tract of land. Thereafter, the council decided to submit the issuance of the permit to the voters in a referendum. The Supreme Court held the issuance of a use permit to be administrative

63

primarily because the Washington Constitution and King County Charter delegated the power to issue the permits to the county council.

In *Paget v. Logan*, 78 Wn.2d 349, 474 P.2d 247 (1970), the Supreme Court held the selection of a public stadium site constituted a legislative rather than administrative or executive act. The court emphasized that a statute declared the acts of locating, financing, constructing, and operating public stadium facilities to be for public purposes and another statute conferred the power of eminent domain on the county to accomplish the public purpose. Significant and inherently legislative problems revolving about streets, traffic, parking, public transportation, utilities, and service facilities become necessarily entwined and interrelated with the choice of any given site. Challengers to the initiative argued that rendering the stadium site selection a legislative rather than an administrative function would frustrate the efficiency of government and promote endless debate and indecision with respect to finalizing any chosen site. The court qualified its ruling by noting that, at some point in time, a proposed stadium project might progress to a point when only administrative decisions will remain to complete the project such that any initiative measures concerning site selection would be inappropriate.

In *State ex rel. Linn v. Superior Court for King County*, 20 Wn.2d 138, 146 P.2d 543 (1944), the court adopted the rule that amending a city charter is legislative in character and may be the subject of a referendum. The court, however, denied the

proponents of the initiative a writ directing the county to place the initiative on the ballot since the proponents had not followed the correct process.

In *State ex rel. Payne v. City of Spokane*, 17 Wn.2d 22, 134 P.2d 950 (1943), the city of Spokane fire chief sued to compel city commissioners to submit to voters a proposed initiative to increase the pay of members of the fire department. The Supreme Court held the fixing of salaries to be a legislative function and subject to an initiative. The city charter placed the fixing of salaries under an article devoted to "Administration of City Affairs." This classification was not controlling because the courts, not the city, determine the nature of the task.

In *State ex rel. Pike v. City of Bellingham*, 183 Wash. 439 (1935), the Supreme Court held the fixing of salaries of firefighters and police officers to be legislative in nature. Thus, an initiative could establish those salaries.